Opinion delivered June 20, 1888.

---

No. 6016.

HENRY TOMLIN *v.* THE STATE.

1. BILLS OF EXCEPTION—PRACTICE —The record showing that the bills of exception were approved and filed in term time, although filed more than ten days after the trial, the presumption obtains, in absence of a contrary showing, that they were presented to the judge within the ten days, for his approval.

2. RAPE—EVIDENCE.—The indictment charged a rape by force. The evidence tended strongly on the one hand to establish rape, and on the other hand tended to establish carnal knowledge with the consent of the female. Under this state of case, the prosecution was permitted to prove that, five years before the alleged rape, the accused told the witness that he had a drug which, administered to a female, would cause her to yield to his carnal passion. *Held*, that the admission of such evidence was material error.

APPEAL from the District Court of Ellis.    Tried below before
the Hon. Anson Rainey.

The conviction in this case was for the rape by force of Ida
Holcomb, and the penalty assessed was a life term in the peni-
tentiary.

Mrs. Ida Holcomb was the first witness for the State.    She
testified that she married her husband, J. S. Holcomb, in Ennis,
Texas, in December, 1886.    She was seventeen years old at the
time of this trial, and was and had been from infancy badly
crippled in one foot.    She had but poor use of one leg and could
only walk with difficulty.    The witness and her husband, soon
after their marriage, went to the Rankin neighborhood and
rented a farm from a young man named H. W. Bush, who,
under the contract, lived in the house with witness and her hus-
band.    The house had but two rooms, the front room being a
combined sitting and bed room, there being two beds in it.    The
rear room was a combined kitchen and dining room.    The front,
middle and back doors were in a line, and were the only doors
in the house.

The witness first met the defendant a day or two after her
marriage.    He was a married man and lived about a half mile
north of the Bush house, in which witness and her husband
lived.    Mr. Pattie lived in a house about half way between the
two.    Mr. Whatley lived south of the Bush house about a quar-
ter of a mile.    Defendant and his family, Pattie and his, and
Whatley and his were the witness's only near neighbors.    The
Rankin neighborhood, as the vicinity was known, was about ten
miles distant from Ennis.    Witness's husband and Mr. Bush
went to Ennis on the morning of April 5, 1887, leaving the wit-
ness at home alone.    About the time witness got through clean-
ing up the house, which was between nine and ten o'clock, the
defendant came to the house.    He spoke politely to the witness,
and witness invited him to take a seat, which he did, placing
his chair near the front door.    Witness then took a seat near
the middle door.    Defendant presently asked the witness where
her husband was, and she told him that he had gone to Ennis.
Defendant then said something about going fishing, and talked
on for perhaps thirty minutes, when he moved his chair toward
witness.    Witness left her seat at once and fled to the back door.
By the time the witness reached the back door, which was
closed, the defendant caught her, seizing each of her wrists with

a hand. Witness begged the defendant to release her, and struggled to get loose, but defendant held her secure by twisting her wrists. He assured the witness that resistance was useless, as he could break every bone in her body, and intended to demonstrate to the witness the difference in men. Witness told defendant that she would rather be killed than forced to submission to him. When he first seized witness she smelled something about him that turned her very sick. Having seized witness's hands, the defendant forced her into a corner of the room, pressed her against the wall and strove to hold her two hands together with one of his hands, while with the other he unbuttoned his pants. About that time witness released one of her hands and scratched defendant's nose until it bled. Defendant then got a stronger hold on witness, threw her on the dining table, which was about four feet by six in size, got on her, pressing her down, and accomplished his purpose by penetrating the witness's privates with his male organ. This act of copulation was performed by the defendant without the consent of the witness and in spite of her protests and importunities to desist.

When he got off the witness and let her up, he took a handkerchief from his pocket and wiped the blood from his nose. The witness told him that she was going to report the outrage to her husband. Defendant replied that, if witness did report it to her husband, either he or witness's husband would die, and that as he, defendant, had a good pistol, he was satisfied that he would not be the one to die. The witness was sick at the time of the outrage; was very much frightened, and did not know at the time what to do. She pleaded with the defendant and resisted him with force until she was overcome, but neither screamed nor hallooed for the reason that she knew that no person was in hearing distance of her. After accomplishing the rape of the witness, the defendant took a seat in the front door. Witness meanwhile sat near the middle door and exchanged some remarks with defendant. She was too much afraid of him to attempt to get him away from the house. As soon as the defendant left, the witness redressed herself and went to the house of Mr. Whatley, determined to report the outrage to Mrs. Whatley if Mr. Whatley was at home. She got to the Whatleys just after dinner, but found that Mr. Whatley was not at home. Her position was an embarrassing one, and she decided, Mr. Whatley being absent, to tell no one until she had told her husband. Consequently she did not tell Mrs. Whatley. Witness re-

mained at Mrs. Whatley's until nearly night, when she thought she saw her husband going home. She then went home to find that the person she saw going to the house was Mr. Bush, and not her husband. About good dusk the defendant and his wife and baby came to witness's house. The witness invited Mrs. Tomlin to take a seat, but did not speak to the defendant during the night. After a while the witness's husband came home and placed his saddle on the porch. He then came into the room and remarked to witness that he had a beef bone in his saddle bags, of which to make soup on the morrow. Witness went to the saddle bags and got the bone, remarking, as she passed with it to the kitchen, that she would make soup on the next day, but she did not invite either the defendant or his wife to dine with her on the next day and partake of the soup.

Defendant and his wife left to go home about bed time, and witness went into the back room to give Mr. Bush time to go to bed. She then came back, and, without undressing, lay down by her husband and, in a whisper, told him all that the defendant had done. That was the witness's first opportunity to tell her husband about the matter. Witness's husband wanted to go to his mother's house at once—that house being about two miles distant—but gave up the idea. Neither the witness nor her husband slept at all during that night. On the next day they went to Ennis, and witness filed a complaint before Justice of the Peace Higginbotham, charging defendant with rape. Witness then went to her mother's house in Ennis, told her what happened on the day before, and showed her the bruises and scratches on her wrists. The witness remembered nothing about going to the cow pen on the evening of the rape, and milking the cows, and singing the while. She knew well that, whether she milked or not, she did not sing. Witness did not tell Mrs. Whatley, on the evening of the outrage, that no gentleman would suggest the carnal subject to a lady unless she encouraged him to do so. Defendant got on witness and penetrated her person with his male organ as soon as he got her prostrate on the table. She did not cross her legs nor kick defendant, nor scream. The witness did not see either Mr. Pattie or his little boy on the day of the rape, and if they or either of them were at work near the Bush house at any time on that day, the witness did not know it. Defendant was once before at witness's house when witness was alone. That was about three months before the rape. Witness's husband and Mr. Bush were then in the bot-

tom getting wood. It was a cold day and defendant came in and sat for some time by the stove. Witness then knew nothing to the discredit of the defendant, and he was a neighbor and an intimate friend of Bush's. She had no reason then to object to his sitting by the stove, and she treated him just as she would have treated any other neighbor. While defendant was sitting by the stove on that occasion, and the witness was sitting near it on the other side, Mr. Pattie came to the door and told witness that his wife directed him to tell witness to send after some milk. Witness replied "all right," and Pattie went off, and witness thought no more of the incident. Witness was not behind the door when Pattie came; nor was she on the bed, either alone or with defendant, nor had she just got off the bed when she spoke to Pattie. The witness's usual weight was about one hundred and twenty pounds.

J. S. Holcomb, the husband of the alleged injured woman, testified, for the State, that when he got home from Ennis on the night of April 5, 1887, he found the defendant and his wife at his house. They remained there until about bed time. After Mr. Bush went to sleep, witness's wife, without undressing, laid down on the bed occupied by witness, and told witness what the defendant did during witness's absence on that day. Witness told Mr. Bush about it on the next morning, and then took his wife to Ennis and she made complaint before Justice of the Peace Higginbotham. Neither the witness nor his wife went to sleep during the night of April 5.

Mrs. Quinn, the mother of Mrs. Holcomb, testified, for the State, that she was at the Bush house a month or two prior to the alleged offense, and then became dissatisfied with the situation of her daughter, because she saw that she was always left helpless when her husband was away from home. Her said daughter had been crippled in one foot from her infancy. When Mrs. Holcomb came to witness's house on the morning of April 6, 1887, she told witness that defendant raped her on the day before, and exhibited to witness her wrists and elbow, which were bruised and scratched.

T. F. Alston testified, for the State, that the defendant came to his store on the day after the alleged rape, and asked the witness: "If a man gets a little from another man's wife, and has to use a little force to get it, what will be the consequence?" Witness replied: "Death or the penitentiary for life." Nick Williams and Mark White, among others, were present. De-

fendant, Nick Williams and Mark White soon left together, and
witness saw neither of them again until after the arrest of the
defendant. Defendant was a man about thirty-three years old,
and would weigh about one hundred and thirty-five or forty
pounds.

Albert Rankin testified, for the State, that, while riding along
the road with defendant on the evening of April 5, 1887, the de-
fendant drew a bloody handkerchief from his pocket, and re-
marked: "If the old woman should see this she would give me
hell."

Roger Haynes testified, for the State, that he was the con-
stable of the Ennis precinct. On the evening of April 5, 1887,
the witness, riding along the road in the Rankin neighborhood,
saw the defendant, Nick Williams, and Mark White, all of
whom, on seeing witness, ran into the brush. Witness had not
then heard of the alleged rape. Before reaching Ennis he met
some parties hunting for defendant with a capias. Witness then
went back to where he had recently seen defendant, but could
not find him. A day or two later he found and arrested defend-
ant in Navarro county.

Mrs. Whatley testified, for the State, that Mrs. Holcomb came
to her house about one o'clock on the day of the alleged rape,
but said notning to her about the defendant. She used a stick
in walking to witness's house, which was the first time witness
had ever observed her using a stick. She did not remark to
witness that a gentleman would not approach a lady with carnal
suggestions unless he had encouragement from the lady, but
witness made some such remark, and Mrs. Holcomb made no
reply. Witness observed that something was the matter with
Mrs. Holcomb. She was usually a lively, laughing, talkative
woman, but on that occasion she seemed dispirited and sad, and
witness's efforts to entertain her failed. Defendant was at wit-
ness's house about ten o'clock on that morning. He asked for
witness's husband, who was gone, and left.

H. W. Bush was the first witness for the defense. He testified
that in April, 1887, he lived in the same house with Mr. and Mrs.
Holcomb. On the morning of the fifth day of that month wit-
ness and Holcomb went to town together. Witness got home
that evening before Holcomb did. He observed nothing unusual
about Mrs. Holcomb on that evening. Defendant and his wife
were there that night, and witness heard Mrs. Holcomb invite
Mrs. Tomlin to dine with her on the next day, and partake of

some soup she intended to make.  Defendant's weight was between one hundred and twenty-five and thirty pounds.

Cross examined by the State, the witness said that he and the defendant were intimate friends and often visited each other. Witness had been to the defendant's house a few times since the alleged rape.  Witness was with the defendant on the day before the alleged rape, and said something about going to town, when defendant said to him: "Take Holcomb with you, I intend to have 'some' from Mrs. Holcomb."  Witness, in reply, advised him to let Mrs. Holcomb alone.  When witness got back from Ennis on the evening of April 5 he went to Mr. Pattie's house and then back to his own house.  He found Mrs. Holcomb in the cow pen preparing to milk.  Witness took the pail from her and told her to go to the house, and that he would milk.  She accordingly went to the house, but if she sang the witness did not hear her.  He heard no singing on that evening at the cow pen or elsewhere.  Witness did not remember that Mrs. Holcomb spoke a word to him on that night while defendant and his wife were at the house.  Witness heard nothing said about defendant having opened a box of peaches, and about Mrs. Holcomb going to defendant's house to partake of them.  On the next morning both Holcomb and his wife told witness of the alleged rape by defendant.  Witness soon afterwards went to defendant's house and found defendant at his horse lot.  Defendant asked witness: "How is the madam this morning?" Witness replied: "She says you raped her yesterday."  Defendant said in reply: "I did not rape her.  I done it to her on the dining table.  I caught her, but she was willing and wrapped her legs around me, and it was the best I ever had."  The witness then told defendant that Holcomb and his wife left his house that morning.  Defendant then asked witness to see Holcomb and make it all right, and that he, defendant, would pay Holcomb money.  Witness went to the house of Holcomb's mother, saw Holcomb and delivered defendant's message.  Holcomb replied that he would not sell his wife's virtue, and witness went back and reported to defendant, who then saddled his horse, said that he was going to leave the country, and asked witness to look after his family.  He then left and witness next saw him in arrest.  Mrs. Holcomb was weeping when she left the witness's house on that morning.

Doctors Jones and Merriweather testified, for the defense, that they knew of no medicine or drug which, if worn upon the per-

son of a man, would so affect another person in the same room as to render such person incapable of screaming or of physical effort.

Doctor Ward testified that excitement might make a pregnant woman sick at the stomach.

Mrs. Tomlin, the wife of the defendant, testified, in his behalf, that she and her husband called at the house of the Holcombs on the night of April 5, 1887. When they reached that house Mrs. Holcomb was in the cow pen, singing. Mr. Bush was also at the cow pen. Holcomb got home soon after witness and defendant got there. Mrs. Holcomb appeared to be in her usual spirits, and laughed and chatted as much and as gaily as was usual with her. She remarked that Holcomb had brought a beef bone home, and that she would have soup the next day. She then invited the witness and defendant to dine with her on the next day. Witness replied that she could not promise to accept the invitation. Defendant remarked that he could bring a box of nice peaches that he had just opened. Mrs. Holcomb replied that peaches, which she liked very much, would be nice. Defendant had no scratches on his face when he came home to dinner on that day. Mr. Bush came to witness's house on the next morning, and told defendant that Holcomb had gone to Ennis to get a writ for his arrest. Defendant then left, and witness did not see him until after his arrest.

Joseph Pattie testified, for the defense, that he lived three or four hundred yards from Holcomb's house. He was harrowing back of Holcomb's house on the morning of April 5, until about eight o'clock, when he went to his brother's, about a mile away, leaving his son, fourteen years old, with the harrow. When he got back he found his harrow doing nothing, and that his son had gone to the house. He had harrowed a few rounds when, happening to look up, he saw the defendant standing near him in the field. He did not know where the defendant came from. He heard no noise of any kind about Holcomb's house on that day. About two months before the alleged rape, when Holcomb and Bush were hauling wood, the witness's wife told him to stop by Holcomb's house and tell Mrs. Holcomb to send for some milk. Witness knocked at Holcomb's closed door between twelve and one o'clock. Defendant called to witness to come in. Witness opened the door a little and delivered his wife's message. Mrs. Holcomb, whom witness could not see,

and who was not at the stove near which the defendant was sitting, said: "All right." The weather was then cold.

Preston Pattie testified, for the defense, that his father left him to harrow the field (the rows of which reached a point within twenty-five yards of Holcomb's house), on the morning of April 5, 1887. About ten o'clock witness saw the defendant go from Whatley's to Holcomb's house. About an hour later the witness saw Mrs. Holcomb standing in her back door. Witness was then down in the field, but could not say that Mrs. Holcomb saw him.

Mrs. Pattie testified for the defense, that she lived near the Holcomb and Tomlin places in April, 1887, and knew both families well. Witness often saw the defendant's horse hitched at the Holcomb gate, before the alleged rape, and often "remarked about it." She saw Mrs. Holcomb in her cow pen on the evening of the alleged rape, and heard her singing while milking the cows. Witness knew Mrs. Whatley. In a conversation about this matter, subsequent to its alleged occurrence, Mrs. Whatley told witness that Mrs. Holcomb was at her house on the evening of the alleged rape, and remarked to her (Mrs. Whatley), that no gentleman would approach a woman on the carnal subject unless encouraged by the woman to do so.

The defendant's bill of exceptions reads as follows:

* * * 2. "Also on the trial of this case the State offered the evidence of Ben Cordele, that over five years ago defendant told him that he had a medicine which, if admistered to a woman, would make her yield to his, defendant's, desires; to which defendant objected on the ground that it was irrelevant and illegal; which objection was overruled," etc., etc.

No brief for the appellant has reached the Reporter.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. On the twenty-eighth day of March, 1888, appellant was tried and convicted for rape, the punishment being fixed at imprisonment in the penitentiary for life. On the fifth day of April, 1888, his motion for new trial was overruled by the court, and on that day sentence was passed on him. On the eighteenth day of April, 1888, appellant's bills of exception were filed and by these are the only questions presented for revision,

except as to the sufficiency of the evidence and the correctness of the charge of the court.

The bills of exceptions being filed in term it is contended by counsel for appellant that they may have been presented to the judge within the ten days, and that, if this was the case, appellant complied with the law. This position is correct, the presumption being that the trial judge would not approve the bills unless presented within ten days.

The motion to quash the special venire is not well taken. There are facts in this record strongly tending to show rape. There are also facts tending to prove that, if appellant had carnal knowledge of the prosecutirix, it was with her consent. This being the state of the case, it is of first importance to the rights of appellant that no facts be admitted in evidence except such as are competent, especially if they were calculated to work injury to him.

The State proved by one Cordele that, five years before the trial, appellant told witness that he (appellant) had a medicine which, if administered to a woman, would make her yield to his desires. To the introduction of this matter the defendant objected on the ground that it was irrelevant and illegal. The objection was overruled and defendant excepted, reserving his bill.

The indictment alleges that the carnal knowledge was effected by force, and the State relies alone upon proof of force for conviction. There is no evidence tending remotely or otherwise to show that, five years ago, defendant knew or had ever heard of the prosecutrix. It is impossible to see the bearing this matter could legally have upon this case or any issue involved in this trial. That a party on trial for horse theft had said that he was a thief, and was thoroughly equipped for the theft business, is as competent evidence as the fact that appellant, five years ago, "had a medicine which would cause women to yield to his lust." The facts in the one case might prove the accused so completely depraved as to be a confirmed horse thief; in the other, that the accused was so thoroughly under the dominion of his lust as to be disposed to commit rape under any and all circumstances. Still, in neither case would the facts be legal evidence.

Under the only vital issue in this case, "consent *vel non*," this irrelevant matter was evidently, to the mind of the writer, calculated to prejudice his case with the jury. He stood before his triers a confessed rake and libertine, capable of any crime to which he might be prompted by his ungovernable passion.

This evidence being incompetent and strongly calculated to prejudice appellant with the jury, under the peculiar facts of the case the conviction should be set aside and a new trial granted.

We will not discuss the sufficiency of the evidence to support the conviction, believing, however, that if the case is tried properly and defendant is convicted, we would not reverse because of insufficiency of the evidence.

The criticism upon the charge made by counsel for appellant is not just. It is not intimated in the charge that all the force necessary to commit rape is involved in that which constitutes an assault or an assault and battery.

For admitting in evidence the matter above noticed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*